AGNES C. JACOB (ALLEGED TRANSFEREE), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SHIRLEY MAY JACOB (ALLEGED TRANSFEREE), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BEVERLY JEAN JACOB (ALLEGED TRANSFEREE), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GWENDOLYN E. JACOB (ALLEGED TRANSFEREE), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 108032, 108033, 108034, 108035. Promulgated July 23, 1942.

---

382

*S. J. Bischoff*, *Esq.*, for the petitioners.
*John Pigg*, *Esq.*, for the respondent.

394

OPINION.

TURNER: But for the lack of coordination on the part of certain of respondent's employees in their efforts to determine and collect the income and excess profits taxes owing by Central, the existence of friction between the stockholders or persons responsible for Central's affairs and the lack of candor on the part of these same individuals in their dealings with each other and with their Government in the matter of Central's tax liability, these proceedings should have

been entirely unnecessary. The question in issue is the liability of the petitioners as transferees of Central for the income and excess profits taxes reported by Central on its return for the fiscal year ended June 30, 1938. That Central was liable for and owed the tax is not disputed and so far as the record shows has never been disputed. The taxes in question resulted in the main from gain realized through the collection of the fire insurance on Central's principal asset, the hotel at Burns. Without making any provision for payment of income and excess profits taxes on the profits so realized, the insurance proceeds were distributed to or for the benefit of the stockholders, leaving Central with no assets except the real estate at Burns, against which stood local taxes far in excess of its value.

The petitioners make a number of contentions: (1) that they never became the owners of the Central stock and furthermore that the stock was sold by Jacob to Barnes and the money received was not received as a distribution by Central but in payment by Barnes for the Jacob stock; (2) that by reason of the prior determination that Jacob, not these petitioners, was the owner of the Central stock, and the subsequent settlement of the transferee proceeding brought by Jacob resulting in entry of decision by the Board to the effect that Jacob was liable as transferee of Central, the respondent made an irrevocable election to treat Jacob as the owner of the Central stock and is now estopped from claiming that the petitioners were the owners thereof and transferees of Central; (3) that if it be held that there was no sale of the stock and the amounts received in respect of such stock were received in liquidation, then Jacob, not the petitioners, was the transferee, since the amounts received in liquidation were not and have not been physically turned over by Jacob to them; (4) that respondent has failed to show that petitioners are transferees of a transferee of Central; and (5) that he has also failed to show that either Central or Jacob was insolvent at the time of the transfer of the assets as claimed by respondent.

We find no merit in the claim that the stock involved in these proceedings was sold to Barnes and that the money received in connection therewith was not received in liquidation of Central. The facts are that Jacob, whether acting for himself or for the petitioners, with Conley decided not to continue in the hotel business with Central or otherwise. They could see a most attractive cash profit as the result of the fire and decided to take it out. From the insurance proceeds they paid the debt to Farrell and certain other obligations of Central and then distributed the balance in three parts to the stockholders, leaving Central in an insolvent condition. Barnes had no intention or thought of buying either the Conley or Jacob stock. There was simply a division of the available assets, which in this

case happened to be cash. Barnes had some idea that if he might control the corporate shell it might be of some use to him in financing the acquisition of another hotel through the use of a portion or all of the money he had received from Central, but it is perfectly plain that he had no intention that Central should own or conduct any hotel business subsequently acquired by him. It is true that Barnes did thereafter convey certain properties at Hines, Oregon, to Central and that when the hotel at Arlington was acquired title to that property was taken in the name of Central, but at the time of acquisition Conley was instructed to have title transferred to Barnes within the fifteen days following. It seems that at some point Jacob had advised Barnes and Conley that Central and indirectly its stockholders would be saved some tax on the insurance proceeds through the application of section 112 (f) of Revenue Act 1936, if Barnes should take title, even though temporary, to subsequently acquired properties in the name of Central, and the petitioners apparently take the view that the above acts of Barnes were prompted by the advice of Jacob and constitute evidence that Barnes purchased the Jacob and Conley stock with a portion of the insurance proceeds in some manner withdrawn by him from the corporation, that Barnes' share of the insurance proceeds was not withdrawn but continued as assets of Central, and that the sums received by Jacob and Conley did not therefore constitute distributions by Central to its stockholders. There is some confusion between Jacob, Barnes, and Conley as to the exact character of the advice originally given by Jacob with respect to the Federal income tax liability of Central and as to the exact time when a letter by Jacob quoting section 112 (f), *supra*, was written and mailed to Barnes. Whatever the facts in that regard, it is apparent that neither Barnes nor Conley understood the advice as Jacob says it was given and, even though we should accept the Jacob version as to the advice actually given, the understanding of Conley and Barnes clearly negatives the interpretation sought to be placed upon Barnes' acts by the petitioners. Barnes took down a pro rata part of the net insurance proceeds just as Conley and Jacob did. On the evidence we think it perfectly clear that the net insurance proceeds were distributed to or for the Central stockholders and no part thereof may be regarded as having been paid for the Jacob or Conley stock by Barnes.

There are numerous claims in the brief of the petitioners that Jacob, and not the petitioners, was the owner of the Central stock and that the respondent has failed to sustain his burden of proving that the petitioners did own the said stock. Even though it be said that the respondent did have the burden of proving that the petitioners were the owners of the Central stock, and regardless of any

evidence that respondent may have offered, it appears that Jacob, the petitioners' witness, has carried that burden for him. Obviously, Jacob knew more than any other person concerning the ownership of the Central shares originally issued in his name, and at no place in his testimony did Jacob ever state that he and not the petitioners were the owners of the stock. To the contrary, he testified in response to questions by counsel for the respondent that he at all times regarded the petitioners as the beneficial owners thereof. He testified that about the time the Welcome Hotel was acquired he advised the petitioners that he was going to give each of them a portion of the stock and that his only reason for not having the stock issued in their names when the corporation was organized was his agreement with Farrell to hold control of Central until the indebtedness to Farrell should be paid. The name Central Holding Co. did not impress itself upon the minds of the petitioners but they were familiar with the subject matter of the gift in that they knew it represented the interest Jacob was acquiring in the Welcome Hotel at Burns. These petitioners had confidence in and trusted Jacob and believed that he would look after their interests. They had had no business experience and anything affecting their business affairs was left entirely to Jacob, the husband and father. As soon as sufficient of the insurance proceeds had been collected the indebtedness to Farrell was paid and immediately Jacob, even though it had already been decided to liquidate Central by the distribution of the insurance proceeds, had 99 of the 100 Central shares standing in his name transferred, 25 shares to each of his daughters and 24 shares to his wife. Such action on the part of Jacob is certainly in harmony with the claim of the respondent that the petitioners were the owners of the stock and with the testimony of Jacob that at all times he regarded them as the beneficial owners thereof. Mrs. Jacob, when she received the certificates at the beach accompanied by Jacob's request that they be endorsed and returned to him, recognized the said certificates as representing the shares of stock which Jacob had promised to give to her and the three daughters. If the issuance of the shares in the names of these petitioners was not intended to evidence actual ownership, then Jacob needlessly put himself and petitioners to much unnecessary trouble and his action in having the stock so issued was without purpose and without meaning. Furthermore, the act of the petitioners in endorsing the certificates and returning them to Jacob as requested is not out of harmony with the conclusion that the stock did belong to the petitioners. They looked to and expected Jacob to handle their business transactions. Accordingly, we find no occasion to repudiate for the petitioners the testimony of a witness which they themselves have called. On the record before us we conclude

that the petitioners were the owners of 99 shares of Central stock at the time the fire insurance proceeds were distributed, 24 shares · belonging to Agnes C. Jacob, and 25 shares each to the daughters.

In the contention that the respondent made an irrevocable election to treat Jacob as the owner of the Central shares and is accordingly estopped to assert transferee liability against these petitioners as the owners of such shares, we likewise find no merit. It is true that the respondent, upon examination of the income tax returns of the petitioners for the year 1937, did conclude that they were not the owners of the Central shares and did not therefore realize gain upon the distribution by Central of the net insurance proceeds. These proceedings, however, are transferee proceedings calling for determination, not of the individual income tax liability of the petitioners, but of their liability as transferees for income tax owing by Central. We find no basis in fact or law for application of the doctrine of estoppel and certainly there can be no proper claim of *res judicata*. Not only must estoppel be pleaded, but the party invoking estoppel must prove the facts to support it. *Helvering* v. *Brooklyn City Railroad Co.*, 72 Fed. (2d) 274; *Commissioner* v. *Yates*, 86 Fed. (2d) 748. In the instant case the petitioners have not shown that they have in any way been damaged or misled to their detriment by the respondent and the claim of estoppel falls. To support a finding of *res judicata* the action in which the finding is sought must involve the same parties, the same facts, the same law. Here the petitioners rely for what they term estoppel by judgment upon the settlement of the transferee proceeding brought by Jacob to determine his liability as transferee for a deficiency in the income tax of Central for the fiscal year 1938 and upon the entry of decision by the Board giving effect to the settlement agreed to by the parties. In the instant case the tax involved is also income tax of Central for 1938, to be exact, the tax reported by Central on its income tax return for the fiscal year 1938, but there the similarity ends. Here the petitioners are Agnes C. Jacob, Shirley May Jacob, Beverly Jean Jacob, and Gwendolyn E. Jacob, not Robert T. Jacob, as in the prior case, and the liability to be determined is their liability, not that of Jacob. *Tait* v. *Western Maryland Railway Co.*, 289 U. S. 620, relied on by the petitioners is clearly distinguishable. There the parties, namely, the United States and the Western Maryland Railway Co., as well as the facts and the law, were the same in the current case as in the prior case, while the petitioners here have never before been parties to any litigation involving their liability as transferees of Central for 1938 or any year and their claim, whether it be termed estoppel by judgment or *res judicata*, is without the necessary factual and legal support.

There is the further contention that the petitioners may not be held liable as transferees of Central because Jacob personally received the money distributed and at no time physically delivered any part of it to them. As to his reason for not delivering the money received to his wife and daughters, Jacob testified that in making the gifts of the shares of stock he did not have in mind gifts of cash or "turning over to them the cash which was realized unexpectedly" and felt that "it would be unwise, as a matter of fact, to turn over to them the cash." It is to be noted, however, that he did not testify that the money did not belong to his wife and daughters or that he did not receive it for them. We have already pointed out that Jacob, on cross-examination, testified that he at all times considered that his wife and daughters were the beneficial owners of the Central stock issued to him, and we have found as a fact that they were the owners of 99 shares of the said stock at the time the fire insurance proceeds were distributed. There is nothing in Jacob's failure physically to turn over the money to the petitioners that is necessarily inconsistent with their ownership of the stock or the money. The testimony of Jacob and the petitioners plainly shows that in all matters business and financial in which these petitioners were interested Jacob acted for them and, not only were they agreeable to his doing this, but they expected it of him. Furthermore, in the signing of the receipt of August 12, 1937, Jacob definitely established his relationship to the money. The money received by Jacob from Central was received for these petitioners and not for himself. The facts here are altogether different from the facts in *W. R. Ross*, 43 B. T. A. 1155, where Ross received the assets of the transferor corporation as his own and not for other individuals "considered" as owning said shares of stock. It is our opinion and we conclude that the petitioners are liable as transferees of Central to the extent of their respective shares of the amounts received by Jacob for them. Sec. 311, Revenue Act of 1936. The liability having attached under the statute, any subsequent appropriation by Jacob to his own use of the funds so received by him for the petitioners can not affect their liability herein.

That the distribution of the insurance proceeds by Central left it insolvent has been found as a fact, and the conclusion that the petitioners were transferees of Central within the meaning of the statute eliminates any necessity for considering their claim that the respondent has failed to prove that they were the transferees of a transferee.

*Decisions will be entered under Rule 50.*